May it please the Court, Counsel, I'm Billy Shelton, I represent Consol Buchanan Mining with me at counsel table is Randall Eads who's my co-counsel and co-author of the brief. Here today to talk to you about the case don't intend unless the court asks otherwise to go over a lot of the facts of the case but strictly base the arguments that we presented to the court and go a little bit deeper than what we presented which was the order issued by the Mine Safety and Health Administration regarding the six inch main supply water valve that was a part of the overall water system at the mine. You haven't really challenged the underlying facts so much as I understand it, correct me if I'm wrong, but my reading is that your primary concern is the degree of culpability and particularly the factors of notice and obviousness? That is correct, that is correct. Basically if you look at the statute, I'm sorry, the regulation that's cited in that order, it's set 30 CFR 75 110-3 which is basically a simple standard that says all firefighting equipment shall be maintained and properly maintained and that is the basis upon which we were cited with that order. MSHA argues that because this main water valve lines broke off of that and serviced the firefighting system there at the mine, it is a piece of firefighting equipment. That's not correct. If you look and we've attached to our brief in the addendum, if you look at the first part of that regulation which is 30 CFR 75 1100-1, it says type and quality of firefighting equipment. If you read down the list, it talks about water lines capable or shall be capable of delivering 50 gallons of water a minute at a nozzle pressure of 50 pounds per inch. So we're talking about the actual fire hose and the amount of water that goes to that fire hose and is able to be delivered in the instance of a fire. Talks about portable. It was kind of a simpleton in the way I approach that question because I just said, well, this is a water line and water is what puts out fires and so how could a water line not be a firefighting equipment? I mean, what other purpose does the water line serve? It's not to drink out of. I mean, if it's not a piece of firefighting equipment, what is it? It has numerous other functions in the mine. Basically, this is the main water supply for the mine. It provides water to the continuous mining machines so that they can have their water sprays to hold down dust as they're a part of the mining procedure. It provides water to the conveyor belts. In case of a fire, you would certainly want to use it, would you not? That would be the source of water coming from the outside of the mine into the mine. The six-inch line is not the water line that puts out the fires. Basically, you break off of the six-inch water line to one-and-a-half-inch lines that then you have a fire nozzle coming off of the one-and-a-half-inch line to which a fire hose is put on and actually used to put out the fire. The regulation talks about type and quality of firefighting equipment. It talks about water lines, portable water cars, a portable chemical car, foam machines, fire extinguishers, things of that nature. It doesn't talk about water valves that are part of the main water system for the mine. Let me follow up on Judge Wilkerson's question. Here, the problem was it couldn't be fully closed. What if the problem had been it couldn't be fully open? Why would that not be a violation of the rule? It may be a violation. I don't know that it's a violation of that regulation because I don't think the regulation deals with that specific valve that's a part of the mainline water system if you look at the plain wording in 75110-1. To go further with that, in regard to that specific issue, the ALJ did not consider any of the testimony of Michael Hockenberry, who was the Secretary's expert. He was an engineer who provided testimony. He said that he was able to close the valve with 50 pounds of torque, easily done by any miner there at that mine. Basically, what caused the valve not to close was there was less than one-eighth inch of dust or rust that when you closed and put the handle on it and moved... The threads of the connector. No, this is on the six-inch valve. It's a gate valve. You basically put a jack bar or something on it. You close it, and there's what's called a valve stop. There was about one-eighth of an inch of rust or dust or dirt or grime that basically caused it to stop three millimeters before it got to the actual valve stop. Don't you, as a general matter, wouldn't you test this sort of equipment on a regular basis? I mean, it seems to me most buildings where I've been and have it, equipment and alarms and things, they're tested periodically. I wonder why you wouldn't... You say, well, we couldn't discern this. It was such a minute thing. But if you tested it, you would know. Well, we do test the firefighting equipment, which is the nozzles and things of that nature, and you're required to test those, and we do those periodically in accordance with what's required by the regs. But these mainline water valves, there's no periodic testing of those that's required by the Act. Why wouldn't you do it? Why wouldn't you test it? Well, I think the test is if water is being provided to the continuous mining machines and you have water in the mine, you know that the valves are functioning properly. There's thousands of valves in this mine, and basically once... There's not a lot of occasions where they're opened and closed. It's only in situations where you have a water line break or you have a situation such that you have to go out by that area, actually close a valve to then replace a piece of pipe, for example. To me, at least, and Judge Wilkerson said it was a simplistic question, but I'm still kind of there. This regulation does include the word water lines. That's correct. My question that dealt with the opening of it, if you couldn't fully open it, let's say, and you could only let a certain amount of water in it, if you don't put in the right amount of water, it violates these regulations. You're correct. So why does that not make it a firefighting equipment from that perspective? Well, because the standard says, when you talk about water lines in paragraph A, water lines shall be capable of delivering 50 gallons of water a minute at a nozzle pressure of 50 pounds per square inch. So, using your example, if you couldn't open the valve appropriately to get, fully open it, to get 50 pounds of pressure at the fire hose, you would write a violation because that fire hose under paragraph A of 751100-1, you would write the violation on the water hose itself because it wasn't producing 50 pounds per square inch. Even though the reason it's not producing has to do with the valve on this line. That's right. And you were saying those are two pieces. I don't get that. It looks like to me they're connected. I don't know how you make that. Okay. All right. I'll move on. I'm asking. I'm not trying to be. I just don't get why that's not connected. I understand. I understand. I think if you look at 751100-1, it sets out what it deals with when you get to dash three when it talks about maintenance of that system, and I think it talks about specifically what you have there. You know, moving on to the next argument, because I know my time is short, the other issue that we find troubling is the consideration of a gentleman by the name of Greg Addington, who was a foreman at the mine, and Judge Ray's consideration of him as an agent of the operator. And the reason that's so important, as you know, is that an agent of the operator, his negligence can be imputed to the operator itself. You know, hourly workers, hourly miners, miners who are doing this, you know, they're tasked of being coal miners. He was the crew chief. I'm sorry? He was the crew chief. I mean, Green and Sanders were taking directions from him, and he was the guy that was overseeing it. He was a foreman. He was a crew chief, and he was the one that was directing the movement of the shuttle car. Why isn't it reasonable for the agency, the administrative apparatus, to regard him as an agent? Well, that's actually not what the proof at trial was. The proof at trial was that first thing you have to recognize is that the movement of this machinery through the mine does not require a foreman to be present. But that's only, I mean, that's the tail end of the question. The other workers certainly seem to regard Addington as the boss, and wasn't he the one who reported to the shift foreman? He is the one who reported to the shift foreman. That's correct. Why don't we have substantial evidence to support what the ALJ found? Well, I think here's the thing. I mean, if you look at the case law, you know, you don't rely upon the guy's title. It's what his function was at the time when he was doing that. The guys who testified, Dave Symones, who was Mr. Addington's boss, he basically said, I've got plenty of foremen tonight. I don't need foremen to go off. I don't need you to go off and inspect this area or whatever. You've never been a part of equipment move. I want you to learn that. I've got two very experienced guys who have done lots of equipment move. Go with them. Be an extra set of eyes in the mine and assist them in doing that. Let me just ask, because this is kind of where I think it's possible to agree with that aspect of it, but that doesn't end the inquiry. Because the movement of the shuttle is done. That's not what's at issue here. It's the accident response that's the problem. And there's nothing here to say he's not capable of being a foreman over a response to an accident or to be able to communicate here. And I don't know, are we discussing something that arose from moving the car or was it something dealing with this response to the accident? And if it's a response to the accident, why is that not the basis for the agency? Okay. And I can address that because I think that's a good point. It's good to break it down that way. If you look at that, okay, let's talk about what happened after the accident or after the shuttle car struck the water valve. The water spewed everywhere, okay? Mr. Addington went to one of the entries to basically use the mine phone to call Mr. Simone to let him know that had been done, okay? He also was driving. One of the other two workers. He's the key. Okay. He's doing this because he's in a supervisory capacity. Making the phone call. Right. That's correct. He's overseeing this thing and as I recall, and I know you want to make the argument, I want to get it out because I think this needs to be discussed. As I recall, those being testified, they would have done what he told them to do. Well, they would have done what they were told because he has the title of foreman. But as far as he never instructed them all, these two guys, Mr. Green and the fellow who was fatally injured, were the type of workers that basically, they hit the water line. They created the damage. They were going to go fix it. They were those type of guys. When I have these ad law cases, the degree of deference that I'm inclined to pay, depends on the degree of expertise that the agency applies in furthering the congressional mission. And isn't this a question where the administrative apparatus and the mine safety commission has a good deal of expertise with equipment in mines and the purpose of equipment in mines and what's an unwarrantable failure and what warrants extraordinary damages and what's just a run of the mill bit of negligence. So much of it depends on how much you know about what goes on within the mine. Certainly. The miners, the equipment and everything. I find myself at a disadvantage because, but when I find myself at a disadvantage and something is not necessarily a matter of common sense but a matter of expertise and an experienced administrative judgment by somebody who deals with this problem day in and day out, why shouldn't we defer? And particularly where you're talking about worker safety and where a life has been lost here. And the lesson I draw from the loss of this life is I don't want to be too casual about this stuff. And it almost seems to me like we are, if we overturn the agency's finding in here, it almost seems, I worry about undervaluing the loss of miners' lives. I really do. I said to, you know, to reverse the agency here, I just, I worry that we undervalue this poor man's life. And, you know, I don't know how all this equipment works. So. I see my time is up. May I provide? Yeah. Judge Wilkinson, I think you're right. I mean, Congress does give a lot of deference to the agency that they, you know, are regulating this, the mining community. I think the important issue in this case, and I understand it, I think that's a lot that went into the ALJ's decision. But the issue in this case that I think makes it, in our opinion, different from other cases is as it relates to the unwarrantable, the extra negligence, the aggravated conduct, the unwarrantable failure, really in terms of notice to the operator. Something that we could have done in advance to stop this or not have this happen. There was no notice to the operator at all. That goes back to our argument in regard to the six-inch valves that, you know, we haven't had handles on those valves for years in that mine. It's inspected. I really do. I understand what you're saying. And perhaps if this were a de novo review, it would carry more weight. But it's not a de novo review. It's a substantial evidence review. And we do know that the workers knew that a connector valve had been broken in half and that the flow of water hadn't been staunched. So there is, I'm not sure, what I'm trying to understand is why we don't have, there isn't substantial evidence in the record to support what the ALJ found. I don't think there's substantial evidence on the issue of unwarrantable failure because the commission has the six standards that it looks at. And, you know, one of the standards that Judge Ray relies upon is the presence of Mr. Addington there. She also relies upon several things in terms of, there's a lot of mitigating factors in the fact that, again, we haven't had handles on those valves for years. This mine is inspected 24 hours a day, seven days a week. There's always an IMSHA inspector at that mine. And we've got thousands of these valves at the mine, never a citation. My opponent argues, well, that's a stopple by inaction. Well, maybe she's right on that as it goes to the fact of the violation. But that doesn't address the issue of unwarrantable failure because that is a substantial mitigating factor from a regulated community to say you have aggravated conduct, but we haven't cited you for it for 30 years. But the lack of it being there is aggravated, reckless conduct on your part. And that's the problem that's hard for us to swallow as a mine that's regulated on an hourly, minute-by-minute basis by IMSHA in an everyday setting. One of the things, the unintended consequence of your position would be that IMSHA is going to be citing mine operators for this, that, this, that, this, that because if they don't issue this citation, they can't seek any kind of heightened penalties. I'm not sure you want this. Judge, we get cited every day. They can't find anything new that they haven't already cited us for, I don't think. But thank you. I'll let my opponent have her time. Thank you. Thank you. Ms. Kiefske, is it? Yes, thank you, Your Honor. Good. Well, we're pleased to have you here. Thank you for having me. Good morning, Your Honors. My name is Cheryl Blair Kiefske, and seated with me at counsel table is Mr. Ronald Gurka. Mr. Gurka had done the trial work in this case and is basically here to hold my hand, among other things. Is that intimidating? Yes, Your Honor, I must say. I'm terrified, and if I faint, please be kind. Your Honor, I would like to address the issues that opposing counsel talked about. He began by concentrating on whether or not the firefighter equipment, whether the valve constitutes the firefighter equipment. Of course it did. This is a system. It's a water system with dual functions, and if a tiny part of a system does not operate properly, the system is not properly functional, and that's what the standard asks. It was a pretty critical part of the system. Absolutely. It was a critical part, and if this were not working, as we found out, a tiny valve, an inch and a half in height, wasn't working, and two quote-unquote experienced rank-and-file miners went ahead and tried to fix it when they shouldn't have. This is a $42 throwaway piece of equipment that killed a man, and this company knew of this. In 1980, there was an accident similar to this. Knew of what? I'm sorry. Knew that this could occur because it did happen. Fortunately, the first time around, the guy was not killed. The miner was not killed, but he was hurt, and these accidents supposedly happen all the time. Mr. Simones had alerted us in his testimony that these accidents happen one when they're moving these large equipments. These accidents happen once in every eight or ten moves. So this is not unusual. As a matter of fact, the morning of, this was the second shift. The shifts at the mines are 7 to 3, 3 to 11, and 11 to 7. This accident happened in the second production shift, the 3 to 11 shift. The morning of that day, the 7 to 3 shift, this exact same equipment, of course with different workers, had done the exact same thing. As they moved it, it damaged. It was a collision, and this exact same thing happened. The difference is that in the morning, the miners who were moving the piece of equipment kept on going, and there's apparently, this happens so often at this mine, that there's designated workers who are tasked with fixing this. In the morning when this happened, those workers fixed it. In the afternoon when this happened, Mr. Simones went as any foreman would be tasked to do, went and made a call to his supervisor who told him, as was the morning crew, I imagine, to leave it and keep on moving the piece of equipment. Somebody is not telling the truth here because Mr. Simones said he told him to keep on moving, and he responded and said, okay. Mr. Addington said he never heard that directive, and by the time he dried himself off and went back to the site of the collision, the two miners who, we all agree, were more experienced in that they had done moves before and Mr. Addington had not, but that doesn't diminish the fact that he was a supervisor. Everybody knew he was a supervisor. His supervisor said he was a supervisor. The opposing counsel wants us to think that he was just a separate pair of eyes sitting there doing nothing. So, okay, he was doing something different than a supervisor would be doing, but he was a supervisor looking on at a move. It didn't diminish the fact that he was a supervisor. He was an agent, and it's undisputed he was a supervisor before. He was a supervisor subsequent to this accident, and we allege that he was a supervisor when this happened. He wasn't a supervisor. Is that the only way you can hold a company in on a respondent superior theory? Excuse me, Your Honor? Is the only way you can hold the company for the fine and the penalties is if you have Mr. Addington as an agent? No, Your Honor. Let's say, hypothetically, Mr. Addington was not an agent. I'm not suggesting that, but would respondent superior liability still attach to the company? Yes, Your Honor, it would attach, but it would not have the added because when a foreman is involved, there's this higher level of care that's attached to it. So the liability would still attach, but you would be less likely to seek the higher penalties? No, Your Honor. This would still be somebody who died. I just don't know. I mean, I'm inclined to agree with you on the agency point, but on the agent point, I just am curious as to what practical difference it makes in terms of the company's exposure or respondent superior or liability or heightened penalties or whatever. Just tell me what practical difference. Your Honor, they knew about this. This was something that happens at this mine. I would not hazard a guess in as much as to say often. Are you basing this on the AOJ's finding that it was obvious and highly dangerous? It was obvious and highly dangerous. They didn't know about it in any event? They should have. What makes it so? And if that's so, then why didn't the inspectors pick up on it? Your Honor, they did. As a matter of fact, this company was cited for this exact same thing, but it wasn't part of this case, only because there was no fatality in that. There was a citation issued because of that. You've never cited them for this shutoff valve, have you? We have never cited them for the shutoff. The defective shutoff valve here. Yes, we did. Was this very valve a subject of a citation? Yes, Your Honor, and the difference with our citation is that in our citation there was a fatality, and we also had the added issue of the grime and coal dust. I had a question about that and the obviousness. Since it appears that at least one of the reports indicated that the damaged threads were only visible on microscopic inspection and the buildup was an eighth of an inch, what makes that obvious in your view? Your Honor, over the years, this is not a supermarket or a different place where things ought to be cleaned. This is a coal mine, so it's expected that there's dust and grime all over. But, Your Honor, the difference with this particular day, with this particular incident, is the fact that before there's a shift start, there is this pre-shift examination that should happen before every shift, and we argue that if this was conducted... If the shift inspection had been conducted, which goes back to my question, would it reasonably have been expected to observe an eighth of an inch of buildup or microscopic thread damage? Is that a reasonable... With respect to... I think the petitioner makes a fair point about the heightened level of culpability, and it does concern me that it is supported, at least in part, by violations that would not have been apparent to the naked eye. Over... They argue that over a 30-year period, this sort of thing would not have been something that stuck out. Your Honor, we had no reason to know. There was never an issue. We had no reason to know that this... I mean, that goes to my point. So I'm asking, how can it be found to be obvious? You're telling me that you didn't notice. Why would it be obvious to consolidate it? Because the valves, when they come from the manufacturers, Your Honors, there's this piece of equipment that's attached to it. This bar is not something that they have to get independently. This bar comes with the valve, and until something happened, in this case, somebody got hit in the head and subsequently got sick. We're asking, where is the valve? I mean, nothing happened. If we were to walk into this beautiful courtroom, Your Honors, and the lights don't go on, we don't realize that there's a problem with the lights until they're not there. This was the case in our case. They didn't realize that these bars were not there because nothing ever happened to put them on notice. The bars came in the packing box with the valve. When you buy a valve, this leverage bar is attached, and we just assumed that it was always used until something happened. The writing aspect of it, in terms of the obviousness of it, and we're looking at substantial evidence that the AOJ could make that determination, and as I recall, he relied upon the testimony of Green, and he also looked to the valve manufacturer's description of it, and Green essentially said that it was difficult to reattach, and you would have known that if it was going to be there, you had problems with the thread, and you also knew it from the manufacturer's statement. I'm trying to align with Judge Duncan's question because I want to make sure we understand the basis of it, but is that the basis upon which you're relying here, or is it just looking at something that they say you need a microscope in order to find? Well, Your Honor, it's assumed that if you know, if you're the person in the mind who knows about threads and these valves, intuitively you are supposed to be able to feel and recognize that there was something wrong. Granted, it was determined with the microscopic finding, but this was a valve that not only came apart. If you're opening a bottle of soda and you unscrew that top, you know that when you put that back on, it's not going to be as tight, and this is what happened in this case, coupled with the fact that there was trauma, if you wish, if you will, excuse me, this whole contraption blew up. So a miner, whether a foreman or a rank-and-file person, should intuitively know that something is not right. That's why most of the miners at this company never even realized it was a two-part valve. They thought it was one part. They threw it away. I mean, lots of them knew, and the manufacturer corroborates this. They don't even sell the parts individually. It's sold as one part, and it's issued. When you buy it, it's tightened with this substance called loctite that when there was this collision, it blew apart. And so, Your Honor, it doesn't make sense. Well, we do know that water escaped, so apparently the connection wasn't as tight as it might have been. So, Your Honor, that one-eighth of an inch that they're making, it seemed like it was not a big deal. Well, it was a big deal because that prevented the contraption from tightening. If you will, this manifold sticks up out of the ground 10, 12 inches, and the top is knocked off. And the water is so powerful that it hits the ceiling of this mine. And that's without it being deterred. They went ahead and turned off some. But the water was still oozing. Opposing counsel said they thought it was residual water. But this residual water was still flowing at that same steady rate 90 minutes after this accident happened. Somebody should have known, whether it's the foreman or these experienced miners, should have known that residual water does not flow for that long after the fact, after it has been turned off. So I think that's just a red herring. There was one other thing, Your Honors, if I may, that they talked about, about the agency, about this gentleman, Mr. Addington, not being a foreman at this particular time. Were he not to be considered a foreman, something affirmative would have had to have been done when the movement was starting. We agree that he had never been a part of a move before. We agree that these two gentlemen were lots more experienced, the two workers. But, Your Honor, just before the move, there was — Who was directing the shuttle car? Excuse me, Your Honor? Who was directing the shuttle car? The foreman was. He was in charge. His boss thought he was in charge. All the miners in the vicinity — and it may remind my friend, Judge Wynn, of the Army and the military, where you have these really totally inexperienced second lieutenants and first lieutenants who are nominally superior to these sergeant majors and master sergeants. And, yes, the second lieutenant has, you know, authority. He can direct the sergeant around. But any second lieutenant would know that you were a fool if you strayed too far from what the sergeant was directing. So is this kind of an analogous situation? Sure, Your Honor. In our case, even more so, because Mr. Addington had been a foreman for 35 years, and he had been — you know, he was in charge of lots of mines. He knew what he was doing. Okay, he managed his foreman job improperly, or we would even say negligently, on this occasion. But it doesn't diminish the fact that he was a foreman. And what we'd like to point out, that were he not to be designated a foreman, before the move started, Mr. Simonis was then tasked with saying to him and all concerned, we know this man is a foreman, but today he is going to be acting not as a foreman, because he's never seen a move. He's just acting as a pair of eyes to sort of look on. But he was a pair of eyes just to look on as a foreman. He was not — I mean, foremen generally don't do the rank-and-file stuff. They observe. So he was observing something for the first time as a foreman. And so to take that designation away from him, I think it's pretty unconscionable. He has always been a foreman, and we allege that he was a foreman before, subsequently, and when the accident happened. Anything further? I think that's it, Your Honor. I just submit that we should affirm the ALJ's decision and the commission, because the commission did not like to touch this. It's the ALJ's decision. I think it should be affirmed in its entirety, because this judge did a masterful job of deciding, analyzing, and determining that the secretary of labor was correct, the solicitor of labor was correct in determining that they had fair notice, that Mr. Addington had been a foreman before this accident, was a foreman at the time of the accident, and was a foreman subsequent to the accident. And to take that away from him, that designation would be improper. Finally, Your Honors, I submit that these two citations were without a doubt unwarrantable. This operator knew that this was happening, that knew that this could happen. As a matter of fact, Your Honors, just before the move start, Mr. Addington went to a section, which is where they keep all their supplies, sort of a supply room, and was looking for valves, because it was the possibility that an accident would happen. It was so high on his list, he was looking for a couple of valves to put into his pocket to take as he went, because this happens. This happens often. And they knew it happened often. As a matter of fact, after this accident, it took somebody to die. What he did, what they did, was change all the valves in the entire mine, which initially, we would allege, should have been changed initially because... He says there are hundreds of them. Yeah, well, Your Honor, they changed them, because the values of the valves that they had, there were 600 PSIs. A 600 PSI reading had never been recorded at that mine. It was always above, and they changed them all to 1,000. Thank you very much. Your Honor, my time is up. I thank you for your time. We thank you. Do you have some rebuttal time, Mr. Shelton? Yes, sir. Thank you, Your Honor. I'll try to address a couple of questions I think you raised, Judge Wilkinson. I think why it's so important that Mr. Addington be an agent of the operator, and it is very important to the Secretary's case, because it's the notice to the operator. That's one of the requirements of an unwarrantable failure violation, is that there has to be notice to the operator. If Mr. Addington is an agent of the operator, the knowledge to him is knowledge to the operator. If he's just a miner and not a supervisor, not an agent, his knowledge is not imputable to the operator. So the question you ask, sir, is it is very important to the Secretary's case that his status at that time, and that's the basis of that. If you look at Judge Ray's decision, and when she discusses the unwarrantable failure determinations, she talks about Addington's presence, Addington's knowledge, Addington being there and observing the situation, and that's what she's talking about is that his presence is the notice to the operator, which, in her opinion, satisfies one of the prongs of the test. Without that, MSHA cannot prove unwarrantable failure, because that's one of the factors that is required in terms of an unwarrantable failure violation. So that's why that's important. Addressing something that Judge Winn asked me in regard to, and I think it's a very good question, and I think it's one that I think sides with my client, is at the time that this valve gets knocked off, Judge Winn said, well, let's look at his actions at that time, and that's consistent with commission law and NLRB law. We cite it in our brief. There's a commission case. It's the R&P Cole case that says the commission examines whether a mining was exercising managerial or supervisory function at the time of his alleged negligence. So that's what we're talking about. That's what you brought up, Judge Winn, in regard to what was he doing at that time. And at the time, again, he went to make a phone call to Mr. Simone's. When he came back, Mr. Green and the individual, I think his name was Saylor, they had already put the one-and-a-half-inch valve back on.  You know, I think Judge Duncan brings it up in regard to the obviousness. In that one-and-a-half-inch valve that came apart, everyone testifies, undisputed, that had never occurred at that mine. Everybody, just like my opponent said, everybody assumed that was a one-piece valve. It actually is two parts, and that was a surprise to a lot of people that we took depositions and actually testified at trial. When it broke apart, these two gentlemen, they looked at the threads, they examined the threads, they felt the threads. It did not appear to be damaged. Aren't we replaying a proceeding that you're very fact-specific and evidence-specific, and I don't blame you, but aren't we replaying a proceeding before the ALJ? Because, you know, he's the fact-finder, and it seemed to me during portions of this argument we were just re-arguing the facts. And I'm just not sure that that's our job. I mean, there is a substantial evidence standard here which mandates deference. Correct. Ben Horton, you've been arguing to me, I'll bet, are some of the same factual assertions and arguments that you made before the ALJ. Am I right? Some are, Your Honor. Some are. Some are. So is this just a do-over? I don't think it is, Your Honor. I think from the legal standpoint and the requirements of the unwarrantable failure standards that have been, it's well-established in commission law that, you know, some of these factors have to exist. Judge Ray did not address those factors. Well, they gave a number of the factors that they said there were five or six of them, that the thread connector was damaged and the seal between the valve body and the tailpiece was destroyed and the handle of the shutoff valve was bent and then there was a hissing valve and flowing water that should have alerted people that the shutoff valve wasn't working. I mean, it's not that they didn't explain it. If it was unexplained, that might, you know, there are four or five factors that the measure says supports an unwarrantable failure here. And, you know, I'm stepping back on this. I appreciate your argument very much, Mr. Shelton, but these mine accidents seem to happen with more frequency than either you or I would like, and they're perfectly horrible because they just seal something, but sometimes, you know, just to die underground like that and, you know, just sort of be entombed when things don't go right. And, you know, I just don't want to be casual with an event where a miner lost his life and to overturn the agency, even given the substantial evidence standard. You know, I come back, I say, I wonder whether, I mean, there ought to be a lesson learned from the loss of life in terms of mine safety and going the extra mile to ensure it. And I'm just afraid if we reverse, given the standard of deference, we would be drawing the wrong lesson from this very tragic event. The standard of review means so much. I understand, Your Honor, and I understand the uphill battle we have in regard to that. But I do think, you know, requiring the ALJ and the Commission to follow the standards and the principles of law that we have, the unwarrantable failure findings and the requirements there, I think don't undervalue the incident or the fatality that we have. I mean, you know, the issue still comes back to, you know, yes, there may have been a violation, but was it aggravated conduct based upon the totality of the circumstances, the totality of the fact, and those six factors that the Commission has set out and relied upon? You had a chance before the ALJ to argue each of those factors, didn't you, and to introduce evidence on them? We did. We did, Your Honor. So how can we replay all of that? Well, I think two ways. I think one way is, you know, looking at Mr. Addington and his status, because, again, as you so eloquently asked the question, what does that do to the Secretary's case if he is not an agent of the operator? That's one. I think the other ones are, as it relates to this issue, that is a significant mitigating factor, which is the obviousness of the violation based upon prior nonviolations. This mine had never been cited for the six-inch water valve. I think my opponent may have gotten it. Thank you, Mr. Shelton. Thank you, Your Honor. We appreciate it. Thank you both for your arguments. We'll come down and greet counsel and move into our next.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, James A. Wynn Jr.